# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

ATTACHMENT 1

**ROBERT E. ELLISTON "PRO SE"**

    **PLAINTIFF,**

    **V.**

**WING ENTERPRISES, INC.**

"Doing business as Little Giant Ladder Systems"

    **DEFENDANT,**

    **&**

**RISK RETENTION SERVICES, INC.**

    **CO-DEFENDANT**

**CIVIL ACTION**

**NO._____**

## COMPLAINT

1.    The plaintiff is a resident of Chilmark, Massachusetts and a citizen of the United States located at:

    Robert E. Elliston, 111 Gosnold's Way, Chilmark, MA 02535  USA

2.    The defendant is a resident of Springville, Utah and a corporation based in the State of Utah located at:

    Wing Enterprises, Inc., 1198 Spring Creek Pl., Springville, UT 84663 USA

3.   The co-defendant is a resident of Milwaukee, Wisconsin and a corporation based
     In the State of Wisconsin located at:
     Risk Retention Services, Inc., 7545 N. Port Washington Road, Milwaukee, WI
     53217 USA

### Jurisdiction

4.   This court has jurisdiction over this matter pursuant to 28 U.S.C. §1332.

### Facts

5.   I didn't get up thinking that I would buy a ladder on April 14, 2012; sometimes,
     your life can turn on a dime. I sat with my coffee in the early morning hours and
     became glued to a television commercial for a ladder. This would not have been
     a surprise for the people that know me, because I have been a builder for more
     than forty years and appreciate the value of good tools. The advertising was
     slick, even though I have always preferred wood ladders for their stability and
     strength. I succumbed to the magic of the new "Little Giant Extreme Ladder".
     Impulsively, I picked up the phone and called the 800# as shown on the
     television screen from my home in Chilmark, Massachusetts, placed my order,
     and paid the $399.96 with my credit card. The ladder arrived in Chilmark on April
     25, 2012. I immediately placed the unopened box with ladder in my Suburban on
     top of my other tools and began my customary three day road trip across the
     country in order to be with my mother for Mother's Day and to take care of other
     business there as well. On April 30, 2012, I removed the ladder from the
     cardboard packaging for the first time and prepared to use it for a small job at my
     second home in Oklahoma. On that bright and dry afternoon, I separated the

articulated ladder into the two separate A-frame or stepladder type sections, as shown on the label that was attached to one of the legs, and which referred to this particular ladder arrangement as the scaffolding position. The ladder consists of two sections: one is a wider outer section with flared legs and the other is a narrow inner section with straight legs. This allows the ladder to be used in several different modes. Next, I placed a 12 foot plank, which was in excellent condition and more than capable of supporting my 165 pound weight, across and spanning the two separate A sections of the ladder. Then, from a standing position on the plank, I started to work at removing roof shingles along the eave of a porch roof which was 8 – 9 feet above the ground. Working from left to right, I finished stripping the lowest courses of roofing and moved the entire scaffolding unit into a second position approximately 10 feet further along the eave. Shortly afterwards, and without any warning, one of the outer legs of the smaller and narrower A section just to my left buckled and snapped off at the bottom rung farthest away from me. I plummeted to the ground and landed with my chest squarely on the upper end of the broken ladder. Later examination by myself, and  corroborated by others, would reveal that the leg had separated along a line running through three holes (out of the total of six holes) drilled through the ladder rail each time a rung was attached.

6.    In a great deal of pain, but not wishing to call for an ambulance, I spent the remaining afternoon and evening resting in a sitting position for the most comfort. I could breathe, just with unusual difficulty, and at times there was intense chest pain. The next morning, fearing a serious injury, I drove myself to the emergency

room of the local hospital, approximately ten miles away. After explaining the
details of the accident and my symptoms, a chest x-ray was taken. Then, I was
immediately admitted and placed in surgery for a right-sided pneumothorax
(punctured lung). The following afternoon, the surgeon removed the plastic tube
which had been inserted in my chest, and I was discharged on May 2, 2012.

7.   My recovery was slow and tenuous for the first three weeks; I was often in pain
     and exhausted. I could not work, and work has always been my life. It took
     three months to feel anything close to normal. Now, after three years, I have
     come to realize that total recovery is unlikely. I simply do not have the same
     respiratory functions, and thus, the stamina that I used to have. I can't sleep on
     my stomach because of the pressure on my chest.

8.   I believe that this court should have jurisdiction, because the matter in
     controversy exceeds the sum of $75,000, and is between citizens of different
     states. I further believe that venue is proper, because a substantial part of the
     events giving rise to this claim occurred in this judicial district. The defendant
     has made minimum contacts with the state, and it would be "fair and reasonable"
     to require the defendant to litigate the claim in this forum state.

9.   A claim of *strict* liability is based on the following facts: (1.) the product in
     question was defective. (2.) The defect was the cause of the described injuries.
     (3.) The defect existed when it left the manufacturer's control. The first defect
     was a failure to warn, and the second defect was a metallurgical weakness which
     should impose *strict* liability, whether or not the manufacturer knew or designed

around the defect. The defendant exercised lack of due care in delivery of this product to the market, where superior access to product information, experimental data and expertise could have gone further to limit the risks that were attached with this newest version of the ladder. *"Failure to study is a failure of due care."*

10.   The defect of "failure to warn" is clearly confirmed by the fact that Little Giant Ladder Systems changed the labeling on the Little Giant Xtreme sometime between April of 2012 and April of 2015. The new label states "DO NOT USE SCAFFOLD ABOVE THREE FEET OR ON THE TOP RUNG". This warning does not exist on the ladder that I purchased in 2012. *"A manufacturer has a duty to provide not just a warning, but an effective warning. Since self-preservation is the most basic instinct, the plaintiff's injury is "proof" that the warning was not delivered or was ineffective."* The safety video that came with my ladder states that the plank can be placed on any rung, except the top rung, which is inconsistent with the new labeling. Also, other than height limitations, stability issues exist with this application of the ladder. The defendants will try to tell you that I over-reached and kicked the ladder system over. I deny this, and assert that I have worked on ladders as a carpenter and builder for 40 years, and I know what it feels like when a ladder starts to tilt. As I stated earlier, this catastrophe came without any warning. All other consumers should be aware of what they are about to attempt without any training. The leg spread, or in other words, the width of the narrow section of ladder, is only 14 ½ inches wide. Therefore; by ANCI 14-2 standards for portable medal ladders, the plank should

be no higher than three times the 14 ½ inch width, or 43 ½ inches. I was not properly advised of this by the information on the ladder at the time of assembly. The leg spread of the outer flared sections, when connected with the trestle brackets, is a very different width of 25 ½ inches. It is still a constituent to the danger of the unassuming user by virtue of its false sense of security. When moving on the scaffold board, from the wide end toward the narrow end, instability greatly increases, and can increase without the user's awareness. The trapezoidal footprint on the ground, created by the wide ladder base on one end, and then, the narrow ladder base at the opposite end, defines a non-uniform stability perimeter. Here again, is a failure to warn, and to encourage anyone to attempt this maneuver without ample warning, or without, providing a stabilizing brace to the base of the narrow ladder, is impending disaster.

11. The second defect, a metallurgical weakness, is obvious and can be confirmed by viewing the resulting broken pieces, along with the photographs taken by myself at the scene of the accident, before anything was disturbed. ANCI 14-2 standards for portable metal ladders states: *"Rung-to-side rail or step-to-side rail connections shall be so constructed as to ensure sufficient rigidity and strength to conform to the requirements of this standard. All connections shall be riveted, welded, swaged, fastened with a locking type bolt or other permanent means."* The ladder in question failed to meet these minimum requirements, as is stated on the ladder label. As I have stated earlier, this accident occurred suddenly and without any warning, and I have read that *"if the product-caused accident was a "shock" or "surprise", then the consumer expectation test is the standard to use.*

A product is defective in design *"if the plaintiff demonstrates that the product failed to perform as safely as the ordinary consumer would expect when used in an intended or reasonably foreseeable manner."*

12. On March 26, 2015, I purchased another Little Giant Xtreme ladder for purposes of comparing and testing; so that I might better understand why this accident occurred. That is how I now know that the labeling has been changed. Furthermore, the new ladder has now failed as well, to meet a design verification test according to ANCI A14-2 for portable metal ladders. In a laboratory testing facility conducted by an expert in failure analysis, the fracture occurred once again through three out of six holes which had been drilled for a way to attach the rung to the rail of the ladder. I am happy to report that, this time, no one was injured.

The plaintiff now seeks relief for damages resulting from these defects and requests for "such other and further relief as this court may deem just and proper" and itemized as follows:

Medical expenses:  (from supporting documents)                    $27,000.00

Medical expenses should be compensated for because the plaintiff should have known better. Even if insurance has paid, I have paid premiums for many years.

Lost earnings:   3 weeks @ full time wages                                    $6,000.00

                        10 weeks @ half time wages                                $10,000.00

Lost earnings should be compensated for because the plaintiff should

have known better.  If insurance had paid, my rates would

have increased, and  I have paid premiums for many years.


Loss of future earning capacity:                                              $40,000.00

(Calculated @ 10% disability for 4 more years to age 70)


Pain and suffering resulting from immediate consequences:        $54,000.00

Who can calculate the value of each breath taken when the agony

associated with each breath is so extreme and cannot be delivered in the

normal manner?

(Calculated @ 2 X Medical Expenses)


Emotional distress:                                                           $54,000.00

Who can calculate the value of the trauma that can live on for years,

following a horrific experience?  The insecurities of having your life

changed without warning; and now, not being capable of doing all the

things that you had always planned, and not even knowing how much

this accident may eventually affect your mortality.  It has been proven

that lung function is the greatest indicator of longevity, and regardless of

what others may think; my lung function was diminished by this accident.

(Also calculated @ 2 X Medical Expenses and is for

past and present day mental anguish, heightened

nervousness & anxiety, excessive worry & insomnia)


Punitive damages:                                                     $191,000.00

This product needs to be rebuilt so others will not fall as victim.

(For reprehensible conduct and reckless endangerment;

calculated @ 1 X all compensatory damages totaling $191,000.00)

13.    The plaintiff demands a trial by jury.


Signature _Robert E. Elliston "Pro Se"_

Name:  Robert E. Elliston  "Pro Se"

Address:  111 Gosnold's Way

Chilmark, Massachusetts 02535

Telephone #:  508 645-9622

(cell)    508 560-5532